Dustin Huffine (Pro Hac Vice)
dustin@huffinechung.com
HUFFINE CHUNG LLP
One World Trade Center, 8th Floor
Long Beach, CA 90831
Phone: (562) 676-4315
Fax:  (213) 814-1448

Michael A. Bowse (Pro Hac Vice)
mbowse@bowselawgroup.com
BOWSE LAW GROUP, A.P.C.
801 S. Figueroa St., 25th Floor
Los Angeles, CA 90017
Phone/Fax: (213) 344-4700

Attorneys for Plaintiff William Margaritis

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| WILLIAM MARGARITIS, an individual,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>VAST MOUNTAIN DEVELOPMENT, INC., a Nevada corporation; HARVEST GOLD SILICA, INC., a Wyoming corporation; JOHN OWEN, an individual; MICHAEL GALVIS, an individual, and DOES 1 through 20,<br><br>　　　　Defendants | Case No.:<br><br>**COMPLAINT FOR:**<br>**1.  SECURITIES FRAUD (15 U.S.C. §78j AND 17 C.F.R. §240.10B-5)**<br>**2.  SALE OF UNREGISTERED SECURITIES (15 U.S.C. §77e)**<br>**3.  FRAUD IN PURCHASE OR SALE OF SECURITIES (ARIZ. REV. STAT. §§44-1991)**<br>**4.  FRAUD**<br>**5.  BREACH OF FIDUCIARY DUTY**<br>**6.  NEGLIGENCE**<br>**7.  NEGLIGENT MISREPRESENTATION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff William Margaritis ("Margaritis" or "Plaintiff"), by and through his undersigned counsel, alleges as follows.  Any allegations in this complaint that are contrary to or inconsistent with one another are made in the alternative.

## I.  **SUMMARY**

1.      This action seeks redress for damages suffered by Plaintiff as a result of, *inter alia*, Defendants' issuance of materially false and misleading statements and the fraudulent concealment of negative facts to and from Plaintiff and others regarding the Company's business practices.  As a result of Defendants' false and misleading statements and fraudulent concealment, which Plaintiff relied upon in investing into, and maintaining his investment in, both Vast Mountain Development, Inc. ("VMD") and Harvest Gold Silica, Inc. ("HGS"), for which Plaintiff has suffered damages in at least the amount of $850,000.

2.      Beginning at the time that Plaintiff initially invested in VMD, and continuing over the last several years during which Plaintiff continued to invest into VMD and acquire ownership in HGS, there has been a consistent and repeated pattern of unlawful conduct committed by Defendants, including but not limited to making numerous false written and verbal statements, fraudulent misrepresentations and concealment, concerning the operations and finances of VMD and HGS, breaches of fiduciary duties, self-dealing, and other wrongful acts and omissions, giving rise to this action.

3.      Seeking to enrich themselves at the expense of Plaintiff and others, Defendants used false information and made fraudulent representations regarding not only the purpose of the business of VMD, but also the operations and viability of the business model for both VMD and HGS, to dupe and defraud Plaintiff and other investors.

4.      Motivated by greed and with total disregard for the people they injured, Defendants have committed numerous illegal acts.  Among other things,

Defendants have breached fiduciary duties to Plaintiff; defrauded investors through the illegal sale of worthless unregistered securities; committed numerous acts of wire fraud and embezzled millions of dollars from individuals and others they were supposed to shepherd in good faith.

## II.   PARTIES

5.     Plaintiff William Margaritis ("Plaintiff") is an individual who is, and at the time the parties made the contract at issue in this action, a resident of Tennessee. Throughout all times relevant to this action, Plaintiff has never resided in this judicial district.

6.     On information and belief, Defendant Vast Mountain Development, Inc. ("VMD") is a Nevada corporation with its principal place of business in Dallas, Texas.

7.     On information and belief, Defendant Harvest Gold Silica, Inc. ("HGS") is a Wyoming corporation with its principal place of business in Dallas, Texas, and was formed for the specific purpose of acting as an affiliate entity to VMD for the development and retail sale of silica-based soil amendment products.

8.     On information and belief, Defendant John Owen ("Owen") is an individual residing in Texas and, at all times relevant hereto, was the founder, chief executive officer, and director of VMD, and was the president and director of HGS.

9.     On information and belief, Defendant Michael Galvis ("Galvis") is an individual residing in Texas and, at all times relevant hereto, was as a director and officer of VMD and served in similar roles for HGS.  Through an entity controlled by Galvis, he was also responsible for soliciting investors on behalf of VMD and HGS and received substantial fees for doing so.

10.     Plaintiff is currently ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants sued

herein under the fictitious names Does.  Plaintiff is currently ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants sued herein under the fictitious names Does 1 through 20, inclusive, and therefore sues such Defendants by such fictitious names.  Plaintiff will amend this complaint to allege the true names and capacities of said fictitiously named Defendants when their true names and capacities have been ascertained.  Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Doe Defendants are legally responsible in some manner for the events and occurrences alleged herein, and for the damages suffered by Plaintiff.

11.     Plaintiff is informed and believes, and on that basis alleges, that all Defendants, including the fictitious Doe Defendants, were at all relevant times acting as actual agents, captive agents or brokers, conspirators, ostensible agents, partners, brokers and/or joint venturers, and employees of all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy and/or enterprise, and with the express and/or implied permission, knowledge, consent, authorization, and ratification of their co-defendants; however, this allegation is pleaded as an "alternative" theory wherever not doing so would result in a contradiction with other allegations.

III.     **JURISDICTION AND VENUE**

12.     This Court has jurisdiction over this action under 15 U.S.C. §77v, 15 U.S.C. §78aa and 28 U.S.C. §1331 because this action arises under federal statutory law, including the Securities Act of 1933 and the Securities Exchange Act of 1934.  The Court has supplemental jurisdiction over all state-law causes of action asserted herein pursuant to 28 U.S.C. §1367(a) because those claims are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States

Constitution.  Alternatively, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), in that there is complete diversity of citizenship between Plaintiff, on the one hand, and each of the Defendants, on the other hand, and that more than $75,000 is in controversy.

13.    Venue of this action in this District is proper because the Working Interest Purchase and Sale Agreement at issue herein contains a venue selection clause that identifies this judicial district as the proper venue for any action arising under or relating to that agreement.  Venue is also proper under 15 U.S.C. §77v and 15 U.S.C. §78aa because each of the defendants is found in this District or is an inhabitant or transacts business in this District, because the offer or sale of securities at issue took place in this District in the district an because each of the defendants participated in the offer or sale of those securities.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events giving rise to the claims asserted herein took place in this District, a substantial part of property that is the subject of this action is situation, and the contracts which are the subject matter of this action were negotiated and executed in this District.

14.    This Court has jurisdiction over the Defendants because the parties to the Working Interest Purchase and Sale Agreement at issue herein agreed to submit themselves to the jurisdiction of this Court.  In addition, the exercise of jurisdiction over each of the defendants is consistent with the United States constitution because they, either personally, or through their authorized agents, purposefully availed themselves of the benefits of this state through intentional contacts with this state.  Among other things, Defendants made written and oral communications in and from this State for the purpose of soliciting, negotiating and arranging the contract at issue herein, met with Plaintiff in this State for the purpose of soliciting, negotiating and making the contract at issue herein and

COMPLAINT

entered into the contract at issue in this action in this State.  The exercise of jurisdiction over Defendants by this Court is reasonable and consistent with notions of fair play and substantial justice because, *inter alia*, Defendants regularly conduct business in, travel to and/or are present in Arizona and can therefore conveniently appear in this Court.

IV.    **FACTS**

    A. **Defendants Solicit an Investment from Plaintiff to Invest in VMD's Congress Mine Tailing Project Using False and Materially Misleading Communications and Fraudulently Concealing the True State of Affairs of VMD**

    15.    Plaintiff was introduced to Galvis in or about 2016.  Plaintiff is informed and believes that Galvis was the initial point of contact for potential investors in the purported gold extraction project at issue in this action and was responsible for soliciting investors to that.

    16.    As part of his solicitation of Plaintiff, Galvis arranged for Plaintiff to tour a mine in Yavapai, Arizona – known as the Congress Mine – where VMD's gold mine tailing project (the "Project") was to occur.  It was during this tour in Arizona that Plaintiff was first introduced to Owen.

    17.    During that visit to the Congress Mine and in follow-up discussions that preceded Plaintiff's investment, Galvis and Owen pitched to Plaintiff the details of a proposed investment in the Project.  According to Galvis and Owen, in exchange for his investment of money, Plaintiff would receive a fractional working interest in the Project.

    18.    In connection with their solicitation of Plaintiff's investment, before Plaintiff agreed to invest in the Project, Galvis (acting for himself, VMD, Owen and the other defendants) provided to Plaintiff a Working Interest Purchase and Sale Agreement (the "Working Interest Agreement") and gave to Plaintiff a sales

memorandum in the form of a business plan ("Sales Memorandum"), each purporting to describe in detail the Project and the purpose for which Defendants were soliciting investments.  On information and belief, those documents were prepared and compiled cooperatively by all Defendants.

19.    According to Defendants, as stated in both the Working Interest Agreement and the Sales Memorandum, gold extraction was the central component of the Project.

20.    Thus, the Working Interest Agreement provided, *inter alia*, that:

21.    VMD's "Plan of Operations" called for the recovery and sale of "*gold, silica and other valuable metals and minerals*."

22.    Plaintiff would have the right to receive gold "in-kind" in lieu of payments in cash, even referencing that Plaintiff would receive his share of unrefined gold in "dore bars", should he elect to do so.

23.    VMD was "formed in 2010 for the purpose of participating in the gold mining industry." (emphasis added.)

24.    In fact, the word "gold" appears no fewer than 9 times on the first page alone of the Working Interest Agreement and appears a total of 25 times in that one document.

25.    The Working Interest Agreement also stated that the Project's gold processing operations would "*commence … as described in the Project memorandum*," i.e., the Sales Memorandum.

26.    Moreover, the Sales Memorandum that Defendants disseminated to Plaintiff in connection with their solicitation of Plaintiff's investment clearly specified the intended purpose and use of funds being raised at that time - to fund "THE CONGRESS MINE GOLD & SILICA RECYCLING PROJECT."  The Sales Memorandum stated that gold extraction from the Congress Mine Tailings would be the primary revenue driver for the Project:

COMPLAINT

> *"We are now poised to begin production of The Congress Mine Gold*
> *& Silica Recycling Project.  Years of third-party scientific studies*
> *calculate up to 2 Million tons of tailings with projections of 100,350*
> *ounces of recoverable gold, 295,290 ounces of recoverable silver and*
> *1.57 million tons of foundry grade silica."*
>
> * * *
>
> *"The processing plan is to build a single circuit closed-loop agitated*
> *vat leaching system to extract the gold and silver and a washing and*
> *tumbling system to clean the silica to over 91% purity."*
>
> * * *
>
> *"The Congress Tailings have two potential values, as a silica sand and*
> *the contained gold values."*

27.    In fact, the Sales Memorandum expressly described the returns that Plaintiff and others could expect to receive based <u>almost solely</u> on the value of the gold to be extracted:

> *"Based on the average prices of $1,000.00 per ounce of gold, $14.00*
> *per ounce of silver and $50.00 per ton of foundry grade silica, and*
> *production costs of $16.00 per ton, the investment project is projected*
> *to provide a 6 to 1 return of capital over the planned four year*
> *processing project."*

28.    The original business plan described in the Sales Memorandum also contained a Use of Funds section that addressed specific equipment costs needed to acquire, set up and operate the gold leaching plant that would extract the gold from the Congress Mine Tailings.  Nothing contained in this Use of Funds section, or anywhere else in the business plan for that matter, indicated or disclosed that Plaintiff would be asked to pony up more money to acquire the needed equipment.

However, Plaintiff is informed and believes that Defendants knew and intended that additional funds would have to be solicited to purchase the equipment actually required for the Project.

29.     The Sales Memorandum also contained a page titled "Permits" that identified a list of required permits needed to actually operate the Project's gold plant, and was accompanied by the following (but ultimately false) statement:

> *"These required permits are currently being reactivated and are scheduled to be approved by the time the pilot plant construction begins."*

30.     According to the Sales Memorandum, construction of the pilot plant was imminent.  It claimed that VMD had already drilled 18 holes in the Congress Mine Tailing and collected 8,000 pounds of material.  It represented that the material recovered through that drilling was already being analyzed by a third party, AuRIC Labs, for

> *"fire assay for gold and silver, 40 element chemical analysis for base metals, laboratory scale leach amenability test, bench scale slurry agitated leach test, and pilot scale testing to determine the scale and design of the plant VMD will need for production."*

31.     Indeed, the Sales Memorandum left no doubt that this analysis was well underway, stating that

> *"AuRIC has been conducting bench scale and slurry tests to design the optimum processing plant…."*

32.     By these statements, Defendants indicated that construction of the pilot plant would begin when pilot scale testing was completed, that pilot scale testing would be completed soon because it was already underway and that the permits required to conduct the Project were scheduled to be approved before that.

33.     Unbeknownst to Plaintiff at the time, these statements regarding the

status and timing of permit approval were false.  In fact, Plaintiff is informed and believes that the required permits were not in the process of being reactivated at the time Defendants solicited Plaintiff's investment and the required permits were not scheduled to be approved within the time represented in the Sales Memorandum.  Plaintiff is also informed and believes that Defendants knew these statements in the Sales Memorandum were false and misleading and that Defendants intended for Plaintiff to rely on those false statements to invest in the Project.

34.    Indeed, the sole reason that Plaintiff decided to invest in the Project was the prospect of the anticipated returns from gold extraction based on the representations by Owen and others that the company was effectively ready to begin extracting gold at the time his investment was being solicited.  Indeed, in a letter signed by Owen and reproduced in the Sales Memorandum, Defendants represented:

> *"We are now poised to begin production of The Congress Mine Gold*
> *& Silica Recycling Project."*

35.    In other words, and as far as Plaintiff knew based on the information disclosed to him, it was all about the gold and extraction of that gold was poised to begin.

36.    Having received and relied upon these false statements and communications, Plaintiff invested $850,000 in the Project, beginning with a first installment in October 2016 and continuing with three additional installments over the course of the ensuing months and years.

**B. <u>After Defendants Secure Plaintiff's Investment, Defendants engage</u>**

COMPLAINT

**in a Pattern of Concealment and Misrepresentation Regarding the Status of the Gold Leaching Plant and Permits Necessary for Its Operation**

37.     Beginning at least as early as October 2017, and after Plaintiff had invested the entire $850,000 in VMD, Defendants made additional misrepresentations to Plaintiff and concealed additional facts from Plaintiff, including regarding the true status of the acquisition of the gold leaching plant required for the gold extraction and the actual status and likelihood of obtaining necessary permits.

38.     In an October 4, 2017 written update to investors, Owen told investors, including Plaintiff that

the *"gold leaching plant is scheduled to be delivered to the site the week after next."*

39.     On October 13, 2017, Plaintiff, along with another prospective investor, visited the Congress Mine, where Owen, who was present and, when asked about the arrival of the gold leaching equipment, told them:

*"all systems are on go and the equipment is being delivered next week."*

40.     Plaintiff is informed and believes that these statements were untrue when they were made and that Defendants knew they were they were untrue and contradicted by facts actually known to Defendants.

41.     Two months later, Galvis circulated to Plaintiff and other investors a memorandum dated December 1, 2017 from Kevin Jones of Cardinal Resources, an engineering consulting company hired by VMD, which stated that there were delays in taking down and refurbishing mill equipment, but failed to provide any detail whatsoever regarding the circumstances of these purported delays.

42.     On December 17, 2017, in his "Letter from the CEO", Owen

represented to Plaintiff and others that equipment delays were no longer a problem by giving a specific (but untrue) timeline for the installation of the equipment:

> "The delivery of the original gold leach plant equipment we sourced in Canada was delayed because of an inaccurate delivery commitment by the procurement agent.  We have successfully sourced another set of our required gold leaching equipment and components also located in Canada, and Ari Hillibrands, VMD's plant operator, Kevin Jones, VMD's gold mining geologist/gold leaching plant designer and I are going there this Thursday to inspect and arrange for the equipment to be shipped to Congress asap.  This equipment will be procured with a lease-purchase option."

> * * *

> "[A]s things are evolving, I am confident that we will more than compensate for the unforeseeable delays with increased returns from the gold and silica price increases."

> * * *

> "My plan is to secure the gold leaching equipment next week in Canada and have it shipped to the Congress site over the next couple of weeks, get it refurbished, have it installed in January, and be in full gold and silica production starting with one shift per day, and realizing sales by February with revenue distributions beginning in March."

43.     Less than a month later, in his January 8, 2018 written update, Owen continued to communicate false statements to conceal the actual truth regarding the gold leaching equipment:

> ". . . we successfully sourced our required gold leaching equipment and components in Canada."

\* \* \*

*". . . we had to negotiate for a few days after our trip, but we have now*
*made a deal and are currently negotiating the sale of the equipment we*
*don't need."*

\* \* \*

*"We will begin hauling truckloads to the Congress Mine beginning*
*next week, weather permitting . . .  The equipment will be hauled over*
*a two to three-week period with the drum filters most likely being the*
*last items to be delivered." (emphasis added.)*

44.    Just a month later, on February 9, 2018, despite having just informed Plaintiff and other investors that the equipment had been sourced and would soon be hauled to the mine, Owen and Galvis made a special plea to Plaintiff and other existing investors to invest <u>additional</u> funds for the purpose of acquiring the needed equipment.

45.    Indeed, in that February 9, 2018 written plea, Galvis (falsely) represented to investors that the <u>only</u> thing missing for production of the gold plant was the funds to close the deal:

*"The Congress Mine Gold & Silica Recycling Project is **inches away***
*from the goal line to be in full production mode **for both gold** and*
*silica." (emphasis added).*

46.    In this same update, Galvis continued the lies to Plaintiff and other investors by claiming that workers, at Owen's direction, were actually doing work to prep the gold leaching equipment to ready it for use:

*"[Owen] has been prepping the site at the Congress Mine to be ready*
*for the installation of the leaching equipment, including setting up the*
*necessary electrical system and plumbing, among other things.  **Work***
***crews are being lined up to work 2-3 shifts per day to refurbish and***

**assemble the leaching plant as quickly as possible***." (emphasis added)*.

47.     The representations in that February 9, 2018 communication turned out to be complete fabrications.  Although Plaintiff only learned the falsity of these statements much later, Defendants knew the statements were false when they made them, but made them anyway with the intent that Plaintiff and other investors would contribute additional funds to the Project in reliance on them.

48.     In reliance upon Defendants' statements that the funds from this special offering would be used to secure the needed equipment, existing investors in the Project agreed to invest additional funds in exchange for additional working interests.  Although Plaintiff did not invest additional funds at that time, he nevertheless relied upon the statements and omissions Defendants made in connection with that special offering by, *inter alia*, not investigating the causes of Project delays or taking actions to recover the investments he had already made in the Project.  Plaintiff believed Defendants' representations that the absence of needed equipment was the only thing stalling the Project.

49.     Upon information and belief, Defendants raised another $1.7 million through this special offering based on the specific premise that funds would be used to acquire necessary equipment, after which the gold extraction operations could be up and running.

50.     Despite Defendants' representations that these funds would be used to acquire the equipment needed to activate gold extraction operations, Plaintiff is informed and believes that the funds were actually used to for other purposes wholly unrelated to the gold equipment and that Defendants knew at the time they were making these false representations that the funds would not actually be used to acquire the needed equipment.

51.     Despite knowing these true facts, Defendants continued to make false

claims about the status of equipment for the Project after raising those additional funds.  In response to a query from investor Pam Russell, on March 4, 2018, Galvis wrote to her and explained away the delays in acquiring the gold leaching equipment - despite having previously emailed her on November 8, 2017 and represented to her that "*the plant is coming from Canada and some of the equipment has been loaded onto trucks to begin the trek to the location.*" **The reality was that the purchase of the equipment had not even been completed at that time.**

C.      **Defendants' False Statements Regarding the Equipment Delays Continued for Months**

52.     Beginning in May 2018 and continuing through the Fall of 2018, Defendants continued to misrepresent and conceal the true status of delivery of the gold leaching equipment.

53.     On May 18, 2018, Galvis sent an e-mail to Plaintiff and other investors blaming the delay on a purported "organic exit interview" while at the same time assuring Plaintiff and others that the delivery would begin the following week:

> "*Deliveries of the gold leaching plant equipment were detained **until the organic exit interview was conducted.**  Now that that has been conducted, delivery of the gold leaching plant begins next week.*" (emphasis added.)

54.     A circular titled "Gold Leaching Plant Update" sent to Plaintiff and other investors on June 29, 2018, prepared by Owen and distributed by Galvis stated that the gold leaching equipment was being delivered, while masking the delays under the guise of bad weather:

> "*We are being told now for the second time by the company that the first batch of equipment is on its way and trucks are rolling our way*

1    *now . . ."*

2    * * *

3    *"With their winter being too harsh to allow them to work on the big*

4    *outside equipment of our plant and winter extending longer than*

5    *normal they are now balancing their work on our plant with their*

6    *other obligations."*

7    55.    In the same June 29 update, Defendants attempted to divert attention

8    away from equipment issues by touting a fictitious **$80 million purchase order**

9    that HGS, the affiliate company of VMD, had purportedly secured, despite

10   knowing that this supposed purchase order in fact had not been secured:

11   *"To offset the gold leaching plant delays, we are working feverishly on*

12   *our silica sales, which we believe are about to explode.  Please see the*

13   *$80 million purchase order discussed on pages 3 and 4."*

14   56.    The lies continued through the summer of 2018.  In his July 2018

15   written update, Owen informed Plaintiff and other investors that VMD is

16   *"expecting to deliver [the gold leaching equipment] the week after the*

17   *fourth of July."*

18   57.    It was not until a September 8, 2018 "Field Report" circulated to

19   Plaintiff and others by Galvis wherein Owen disclosed to investors, *for the first*

20   *time,* that VMD had long been experiencing serious problems in obtaining permits

21   necessary to construct and operate the gold leaching plant.  In hindsight, these

22   permitting problems were at the root of Defendants' efforts to misrepresent and

23   conceal the true facts regarding the Project and its delays.

24   58.    Accompanying this September 8, 2018 Field Report was a September

25   4, 2018 report from Kevin Jones of Cardinal Consulting, VMD's consulting

26   mining engineering group.  That report revealed that VMD, Owen, Galvis and

27

28

others were aware of serious permitting issues *as early as 2016*.[1]  Despite all of the "updates" provided over the course of the preceding two years, nothing was ever disclosed to investors regarding the seriousness of the permitting issues that VMD, Owen, Galvis and others had long known about.  Indeed, VMD, Owen and Galvis concealed the existence and seriousness of these permitting issues by blaming the failure to start gold extraction on delays in VMD's receipt of the equipment needed to perform that work.  Plaintiff is informed and believes that the equipment delays VMD, Owen and Galvis had blamed on third parties were actually occurring because Defendants were not diligent about obtaining the equipment because they knew that, without permits, gold extraction could not begin anyway.

59.     In spite of this Field Report, Owen attempted to downplay the permitting issues by not only misrepresenting to Plaintiff and other investors the timeline for resolution, but also by falsely representing to Plaintiff that there was favorable legal precedent for resolution:

> *"We have been working with the Arizona regulatory authorities to find a satisfactory resolution to a permitting issue they had raised for our gold leaching plant in late February of this year."*
>
> * * *
>
> *"We continue to have discussions on how to close the APP with AZDEQ and believe that we will resolve the issue within 60 days."*
>
> * * *
>
> *"We firmly believe that with the support of a veteran environments [sic] lawyer, we can advance our case to a favorable resolution with the state.  **Meanwhile, we are committed to reclaiming the site as planned.** (emphasis added).*

---

[1] In direct contradiction to this Field Report, a January 26, 2016 "Permits Update" prepared by Owen and delivered to investors expressly communicated that "*Cardinal did not see anything being an issue*."

60.     Despite Owen's proclamations, Plaintiff is informed and believes that no meaningful efforts to reclaim the site have actually been undertaken by Defendants.

61.     Upon information and belief, VMD has raised in excess of $16 million for the express intention of having the funds sufficient and necessary to bring the gold leaching plant into operation.  Yet not one meaningful ounce of gold has been extracted from the Congress Mine Tailing by VMD despite the millions of dollars Defendants solicited and received from Plaintiff and other investors for this very purpose.

**D.     Defendants Form HGS as an Affiliate Business to VMD and, In Doing So, Divert Focus and Resources away from VMD That Resulted in a Pattern of Gross Mismanagement, Self-Dealing and Breach of Fiduciary Duties**

62.     On October 4, 2018, Plaintiff was given a 2.04% profits interest in HGS, an affiliate business of VMD formed by Owen, Galvis and others for the purpose of developing retail sales of silica-based soil amendment products.  The profits interest was given to Plaintiff to appease Plaintiff and other VMD investors regarding the operational delays pertaining to VMD.[2]

63.     Because Plaintiff wanted to ensure that he did whatever necessary to protect his investment in VMD, he agreed to provide Owen and his HGS staff sales leads in hopes that this new, retail model would have better results than had the VMD Project.  At one point, Owen even asked Plaintiff to come on board and run HGS, and while Plaintiff and the HGS team (including Owen and Galvis) exchanged terms for compensation, Plaintiff ultimately never became involved

---

[2] Plaintiff subsequently acquired an additional 2.0% profits interest in HGS for certain consulting services Plaintiff provided to HGS relating to the introduction of sales leads, which ultimately brought his full profits interest stake in HGS to 4.04%.

with HGS beyond occasionally offering contacts to Owen.

64.     Although Owen held himself out to Plaintiff as being an experienced "operator" based on his purported construction background, Owen in fact lacked the knowledge and experience needed to lead a large-scale consumer product business and to execute on the HGS business model.

65.     Plaintiff subsequently learned that, like Owen himself, the team Owen assembled to run HGS desperately lacked the experience, skills, resources, and expertise required to execute a business plan like the one for HGS, particularly one with revenue and sales volumes as great as Defendants touted to Plaintiff and others in order to solicit their acceptance of interests in HGS.

66.     To make matters worse, on multiple occasions Defendants misrepresented and concealed from Plaintiff and others the true status of purchase orders that HGS had purportedly secured.

67.     The $80 million "purchase order" that Owen and Galvis touted in their June 29, 2018 update turned out to be recklessly fabricated:

- It was created on HGS letterhead, rather than the actual company from whom HGS should have received the purchase order.

- If anything at all about a purchase was communicated to HGS, it was not binding on the other party, which flies in the face of what a legitimate purchase order is - a binding commitment on which HGS could rely and against which it could enforce its rights against the purchaser.

- Owen informed Plaintiff and other investors that HGS was "under confidentiality" and, as a result, redacted the company information, including the name of the purported purchaser and the last name of the signatory to the purchase order.  In his update, Owen even went so far as to redact other information about the company which

purportedly executed the purchase order.  Plaintiff is informed and believes, however, that HGS was under no confidentiality obligation that would prevent its own investors from being privy to the information Owen redacted.

68.     Even before creating that fictitious $80 million purchase order, in as early as December 2016, and in furtherance of Defendants' pattern of false and misleading statements that continued at least until late 2018, Galvis informed investors that VMD had received purchase orders worth $3.3 million in actual sales even though, Plaintiff is informed and believes, Galvis and the other Defendants knew those purported purchase orders did not actually exist.

69.     Owen and the other Defendants also repeatedly provided inflated and wildly unrealistic sales projections for the HGS business.  For example:

- A February 2018 four-year revenue projection circulated by Owen and Galvis to Plaintiff contained revenue assumptions that, even if they were reasonable for some portions of those years, made no adjustments to account for the seasonal nature of the product they were actually selling.

- A June 19, 2018 update by Owen told Plaintiff and other investors the receivables for the first two weeks of July were "$44,430 in sales" and then touted that HGS' vice president of sales would be securing *"$4 Million in revenue by the end of October"* with nothing more than reference to "*exciting prospect.*"  This update went on to tell Plaintiff and investors that a "*remaining $6 million in sales in the current pipeline ... would be collected by December*" even though Defendants knew there was no legitimate basis for that statement and knew that the sales it proclaimed would not be realized.

- A September 8, 2018 "Field Report" prepared by Owen and

circulated by Galvis falsely stated:

> *"At this moment, HGS has commitments from customers*
> *to purchase 3,500 tons of material between September*
> *and December."*
>
> *"Additionally, we are obtaining orders from Menard's, a*
> *large midwestern home improvement retail network of*
> *310 stores."*

- A September 8, 2018 "Progress Report" included a four-year operating profit projection of over $400,000,000, with no legitimate basis provided for how such a sum could be achieved.

70.     Ultimately, Plaintiff came to learn that among the reasons Defendants made all of these false statements to solicit Plaintiff's investment of $850,000 and then to conceal that fraud for so long was that Defendants were diverting much of that money to themselves.  Galvis, for example, has received 35% of all funds raised to date for VMD and HGS either directly or through entities he owns, controls or serves in an executive capacity.  As a director of both VMD and HGS, Galvis has committed self-dealing and breached his fiduciary duties to VMD and HGS by enriching himself and entities controlled by him to the detriment of VMD and HGS.

E.     Defendants Knew Their Misrepresentations and Omissions Were Material, Misleading and Illegal Because They Have Previously Been Found To Have Violated State Securities Laws By Similar Conduct

71.     Remarkably, this is not the first time at least some of these defendants defrauded investors in connection with sales of working interests in the Congress Mine.

72.     On June 27, 2006, Defendant Owen, along with others, was ordered by the California Corporations Commissioner to desist and refrain from selling securities in California by means of false and misleading statements.  A copy of that Desist and Refrain Order is attached to this complaint as **Exhibit A**.

Thereafter, on June 27, 2007, defendant Owen became subject to a stipulated order of the California Corporations Commissioner (the "Stipulated Order") that included the same prohibitions as the Desist and Refrain Order and expanded upon them.  Both the Desist and Refrain Order and the Stipulated Order are final orders of a state securities commission based on a violation of a law or regulation that prohibits fraudulent, manipulative, or deceptive conduct.

73.   When issuing these orders, the California Corporations Commissioner found that defendant Owen, along with his co-conspirators, defrauded investors in connection with the sale of securities to raise funds for the ostensible purpose of mining gold from Arizona gold mines, including the Congress Mine at issue here. Specifically, the Commissioner found:

> *"Beginning in or about July, 2005, ... Owen [along with others] offered or sold securities ... to raise funds to mine gold from ... the Congress Mine....."*
>
> * * *
>
> *"[They] claim[ed] recoverable gold assets totaling 19,800,000 ounces of gold exist within [the mines].  [But omitted] to tell investors and potential investors that since the late 1800's, in the history of the entire state of Arizona, the total, cumulative amount of gold recovered from all mining activities from gold lode mining, placer gold mines, as well as recovery as a byproduct from silver, copper and/or other base metal mining is only 16,000,000 ounces."*
>
> * * *
>
> *"[They] [f]ail[ed] to tell investors that, at the present time, no primarily gold producing mines are currently, actively, economically mining in Arizona."*
>
> * * *

*"[They failed to disclose that] the U.S. Bureau of Land Management (BLM) denied IER, Inc.'s application for a permit to occupy the property and begin mining operations on the site"*

74.     In other words, the conduct at issue there was remarkably like the conduct at issue here.  Both involved the illegal sale of unregistered securities.  In both cases, the securities were purportedly being sold to raise money for the extraction of gold from the Congress Mine.  And, in both cases, there were serious – but entirely undisclosed – problems with obtaining permits necessary to begin gold extraction.

75.     Indeed, the California Corporations Commissioner was not alone in making these findings.  Both the State of Washington and the State of Maryland issued similar, related cease and desist orders regarding sales of those same securities.  But even more to the point, in a report attached as **Exhibit B** to this complaint, the Arizona Department of Mines and Mineral Resources issued findings nearly identical to those made in California that reflect conduct eerily similar to that at issue here:

*"The number of ounces of gold reported by IER is very surprising and difficult to accept by comparison to historic data. This is especially problematic for a well explored terrain with a significant mining history such as Arizona's."*

\* \* \*

*"IER states production is planned for 2005 and 2006 without disclosing the lack of operating permits or the years typically required to obtain them. Similarly, a lengthy process is required for approval of an Environmental Impact Statement for a major mining project."*

76.     None of the Defendants disclosed any of these orders or findings (or their existence) to Plaintiff.

77.     It is clear then, that Defendants' scheme and conduct here are neither a mistake nor an isolated occurrence.  Instead, they are part of a pattern of fraudulent and illegal activity centered around the sale of bogus working interests in Arizona gold mines.

## F.     **Defendants' Misstatements and Omissions Fraudulently Concealed Their Wrongdoing from Plaintiff**

78.     Plaintiff did not learn of the falsity of Defendants' representations until at least the second half of 2018.  Nor could Plaintiff reasonably have discovered Defendants' fraud earlier than he did, since Defendants concealed the falsity of their early representations and hid their early omissions through their subsequent misrepresentations and omissions.

79.     Thus, Defendants' claims that VMD's gold extraction was being stalled by equipment delays caused by third parties were not just false; they were intended to conceal and did conceal the fact that VMD had not received and was not going to receive permits necessary to conduct that work.  Likewise, by blaming equipment delivery delays on vendors, weather and "organic exit interviews," Defendants concealed that they were not acting diligently to acquire equipment for gold extraction, which was the actual reason for equipment delays.

80.     In fact, Plaintiff is informed and believes that Defendants knew all along that VMD would experience, and in fact was experiencing, serious difficulties in obtaining necessary permits.  Plaintiff is also informed and believes that Defendants knew that the principal reason for the equipment delays was their own stalling and lack of diligence.

81.     Plaintiff reasonably relied on Defendants' representations that the Project was being stalled by third parties' delays in delivering equipment.  In each instance, Defendants' claims appeared reasonable under the circumstances known to Plaintiff at the time.  Because Plaintiff reasonably believed Defendants'

- 24 -
COMPLAINT

representations, he had no reason to investigate the truth or accuracy of their representations and omissions regarding permits.

82.     Moreover, because of Defendants' ongoing misrepresentations and omissions, Plaintiff did not know that his investment in VMD was effectively lost because gold extraction was unlikely to ever happen.

83.     As a result of this misconduct by Owen and the other Defendants, Plaintiff has been damaged in an amount to be proved at trial but which is estimated to be at least $850,000.

## FIRST CAUSE OF ACTION

### (Securities Fraud – 15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5)

(Against VMD, Owen, Galvis and Does 1-10)

84.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

85.     Defendants violated §10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff.

86.     Starting prior to Plaintiff's initial investment and continuing until after Plaintiff made his last investment of money into the Project, Defendants Owen and Galvis, acting on behalf of themselves and VMD, made, disseminated or approved the false statements alleged in paragraphs 18 to 26 and 29, above, to Plaintiff in connection with their offers to sell these securities to Plaintiff, which they knew or deliberately disregarded were misleading in that they were either blatantly false or were misleading because they failed to disclose material facts

necessary to make them not misleading in light of the circumstances under which they were made.

87.     For the reasons alleged, including in paragraphs 28, 45, 52-53, 55-56, 65 and 66-71 above, each of those representations was untrue when it was made and/or omitted material facts necessary to make each representation, in light of the circumstances under which it was made, not misleading.

88.     As alleged herein, the Defendants knew that their statements were materially false and misleading or acted with a reckless disregard of a substantial risk that their statements were false and misleading.  As set forth elsewhere herein in detail, Defendants, by virtue of their possession and receipt of information reflecting the true facts regarding the Project participated in the fraudulent scheme alleged herein.

89.     Defendants also had reason to conceal the true facts and adverse information known to them from Plaintiff and other investors.  Indeed, Defendants' false and misleading statements about the status of equipment needed for the Project and the status of permits needed for the Project were necessary not only to make it an attractive investment, but also to enable Defendants to successfully solicit additional investments from Plaintiff and other investors.

90.     To that end, Owen and Galvis, acting on behalf of themselves and VMD, also made the representations alleged in paragraphs 33-34, 36-38, 40-41, 46, 48-51, 54 and 59-64 above, to Plaintiff and other investors in a successful attempt to conceal the falsity of their earlier representations regarding, *inter alia*, the status of the Project, the status and likelihood of obtaining permits necessary to the Project and the causes of delays in the Project.

91.     As alleged in paragraphs 35, 39, 42, 45, 52-56, 59 and 62-71, those representations were untrue when made and/or omitted material facts necessary to make them, in light of the circumstances under which they were made, not

misleading.

92.     Documents that Defendants sent to Plaintiff and other investors in September 2018 revealed that Defendants knew, at least since 2016, that there were and would be serious issues with obtaining permits necessary to conduct the Project.  In fact, due to their involvement in or connection to the securities at issue in the California Corporations Commissioner's 2006 Desist and Detain Order, which involved the same Congress Mine at issue here, Defendants knew that obtaining necessary permits for the Project was unlikely or, at a minimum, would cause very substantial delays to the Project.  Falsely blaming delays in the Project on equipment vendors helped Defendants to conceal these permitting problems from Plaintiff and other investors while Defendants solicited additional funds.  Certainly, Defendants knew that if Plaintiff and other investors became aware that project delays were actually caused by permitting issues, Plaintiff and the other investors would have concluded that the delays were permanent or very long term and that they could not be solved with additional capital.

93.     In addition to these false statements and omissions, Defendants also failed to disclose the California Corporations Commissioner's 2006 Desist and Refrain Order and the 2007 Stipulated Order against Owen despite their obligation to do so under the S.E.C.'s "Bad Actor" Disqualification and Disclosure requirements, 17 C.F.R. §230.506(d) and (e).  Both the Desist and Refrain Order and the Stipulated Order constitute final orders of a state securities commission based on a law or regulation that prohibits fraudulent, manipulative, or deceptive conduct.  One or both were entered within ten years prior to the sale of the securities at issue here to Plaintiff.

94.     Despite this, relying on Rule 506(b) (17 C.F.R. §230.506(b)), Defendants claimed and represented that the securities sold to Plaintiff were exempt from the registration requirements of the Securities Act of 1933, but failed

to disclose the 2006 Desist and Refrain Order and the 2007 Stipulated Order against Owen in writing to Plaintiff and other investors as required by the S.E.C.'s "Bad Actor" Disqualification and Disclosure requirements contained in 17 C.F.R. §230.506(d) and (e).  Had those required disclosures been made to Plaintiff, he would not have purchased the securities at issue in this action.

95.    Plaintiff has suffered damages in that, in reliance on Defendants' false statements and omissions alleged herein, he invested money that he otherwise would not have invested had he known the true facts that Defendants knew.

96.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Plaintiff is entitled to an award of damages in an amount to be proved at trial.

## SECOND CAUSE OF ACTION

### (Sale of Unregistered Securities – 15 U.S.C. §77a, *et seq.*)

(Against VMD, Owen, Galvis and Does 1-10)

97.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

98.    The working interests that Defendants sold to Plaintiff are securities within the meaning of the Securities Act of 1933.  Defendants sold those working interests in the Project to Plaintiff in exchange for money.  The Project is a common enterprise in that any return on Plaintiff's investment would be obtained through the efforts and success of Defendants.  Plaintiff held no right to operate or manage the Project, the Congress Mine, the Congress Mine Tailing or any mining in the mine or tailing, and instead only received a right to share in the value produced by the Project or to profit from the sale of his working interest.

99.    On information and belief, the sale of these securities did not qualify for exemption from registration under the "private sale" provisions of 15 U.S.C.

§77d.

100.   Despite these facts, Defendants did not register the securities sold to Plaintiff and other investors as required by Section 5 of the Securities Act of 1933, 15 U.S.C. §77e.  Instead, Defendants sold these investments to Plaintiff and other purchasers without filing any registration statement with the Securities and Exchange Commission.

101.   Although Defendants claimed that the securities sold to Plaintiff qualified for an exemption from these registration requirements under Rule 506(d), they did not.  At a minimum, Defendants were prohibited from invoking or relying upon that exemption because they failed to provide any disclosure, let alone written disclosure, of the California Corporations Commissioner's 2006 Desist and Refrain Order and the 2007 Stipulated Order against Owen, as required by the S.E.C.'s "Bad Actor" Disqualification and Disclosure requirements, 17 C.F.R. §230.506(d) and (e).

102.   Both the Desist and Refrain Order and the Stipulated Order constitute final orders of a state securities commission based on a law or regulation that prohibits fraudulent, manipulative, or deceptive conduct.  One or both were entered within ten years prior to the sale of the securities at issue here to Plaintiff.

103.   Accordingly, Plaintiff is entitled to the remedies provided in 15 U.S.C. §77l, including the recovery of all consideration he paid to Defendants.

**THIRD CAUSE OF ACTION**

**(Fraud in Sale of Securities – A.R.S. §44-1991, *et seq.*)**

(Against VMD, Owen, Galvis and Does 1-10)

104.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

105.   The working interests that Defendants sold to Plaintiff and the

agreements by which they were sold to Plaintiff are securities within the meaning of the Arizona Securities Act, A.R.S. §44-1801(27).  Those working interests are fractional undivided interests in mineral rights.  Alternatively, the agreements by which Plaintiff received those working interests constitute investment contracts, commodity investment contracts, or certificates of interest or participation in profit-sharing agreements.

106.   On information and belief, these securities did not qualify for any exemption from registration under any provision of the Arizona Securities Act, including without limitation A.R.S. §§44-1843 to 44-1847 or any regulations adopted thereunder.

107.   As alleged herein, Owen and Galvis, acting on behalf of themselves and VMD, made the representations alleged in paragraphs 18 to 26 and 29, above, to Plaintiff in connection with their offers to sell these securities to Plaintiff.  Each of those statements was material to Defendants' offers to sell those securities to Plaintiff and to Plaintiff's acceptance of those offers to sell.

108.   For the reasons alleged in paragraphs 28, 45, 52-53, 55-56 and 65-71 above, each of those representations was untrue when it was made and/or omitted material facts necessary to make each representation, in light of the circumstances under which it was made, not misleading.

109.   Through their actions alleged herein, Defendants illegally employed a device, scheme or artifice to defraud Plaintiff and other investors and engaged in transactions, practices and a course of business which operated as a fraud and/or deceit.

110.   As is alleged herein, Owen and Galvis, acting on behalf of themselves and VMD, also made the representations alleged in paragraphs 33-34, 36-38, 40-41, 46, 48-51, 54 and 59-64 above, to Plaintiff and other investors in a successful attempt to conceal the falsity of their earlier representations regarding, *inter alia*,

the status of the Project, the status and likelihood of obtaining permits necessary to the Project and the causes of delays in the Project.  As alleged in paragraphs 35, 39, 42, 45, 52-56, 59 and 62-71, those representations were untrue when made and/or omitted material facts necessary to make them, in light of the circumstances under which they were made, not misleading.

111.   VMD, Owen and Galvis knew that those representations and omissions were false and misleading when they made them.  Yet, acting in concert with one another and Does 1-10, they made those false and misleading statements and omissions to Plaintiff with the intent that Plaintiff would rely upon them.

112.   Indeed, those representations and omissions were a material inducement to Plaintiff's investment of $850,000 in the Project in exchange for a working interest in it.

113.   Plaintiff's reliance on the statements and omissions of VMD, Owen and Galvis was reasonable under the circumstances.

114.   Plaintiff has been damaged by this fraudulent conduct of VMD, Owen and Galvin alleged herein.  Plaintiff's reliance on the misrepresentations and omissions made by these defendants was a substantial factor in causing Plaintiff to suffer that harm.

115.   Accordingly, Plaintiff is entitled to the remedies afforded by A.R.S. §§44-1998 and 44-2002, including an order voiding Plaintiff's purchase of these securities and ordering that all of the money Plaintiff paid to purchase these securities (or an amount equivalent thereto) be awarded to Plaintiff as damages, plus interest thereon, taxable costs and attorneys' fees.

## FOURTH CAUSE OF ACTION

### (Fraud)

(Against VMD, Owen, Galvis and Does 1-10)

116.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

117.   As alleged herein, Owen and Galvis, acting on behalf of themselves and VMD, made representations alleged in paragraphs 18 to 26 and 29, above, to Plaintiff and other investors in the Project regarding, *inter alia*, the status of the Project, the status and likelihood of obtaining permits necessary to the Project and the timeline for the Project.  Each of those statements was material to Defendants' representations designed to obtain money from Plaintiff and to Plaintiff's decision to provide that money.

118.   For the reasons alleged in paragraphs 28, 45, 52-53, 55-56 and 65-71 above, each of those representations was false when it was made and/or omitted information known to these defendants that was necessary to make the representation not misleading.

119.   As is alleged herein, Owen and Galvis, acting on behalf of themselves and VMD, also made the representations alleged in paragraphs 33-34, 36-38, 40-41, 46, 48-51, 54 and 59-64 above, to Plaintiff and other investors.  Those representations were material to Plaintiff's ability to discover, evaluate and know the falsity of defendants' prior statements and to take action based thereon.  Those representations were also material to Plaintiff's decision whether to accept interests in HGS (and, if so, how much) in exchange for his services and other consideration.

120.   As alleged in paragraphs 35, 39, 42, 45, 52-56, 59 and 62-71 above, those representations were untrue when made and/or omitted material facts necessary to make them, in light of the circumstances under which they were made, not misleading.

121.   VMD, Owen and Galvis knew that those representations and

COMPLAINT

omissions were false and misleading when they made them. Yet, acting in concert with one another and Does 1-10, they made those false and misleading statements and omissions to Plaintiff with the intent that Plaintiff would rely upon them.

122.   Indeed, those representations and omissions were a material inducement to Plaintiff's investment of $850,000 in the Project in exchange for a working interest in it.

123.   Plaintiff's reliance on the statements and omissions of VMD, Owen and Galvis was reasonable under the circumstances.

124.   Plaintiff has been damaged by the conduct of VMD, Owen and Galvin alleged herein and his reliance on the misrepresentations and omissions made by those defendants was a substantial factor in causing Plaintiff to suffer that harm.

125.   VMD, Owen and Galvis made those misrepresentations and omissions with malice, oppression or fraud and with the intent to cause damage to Plaintiff, entitling Plaintiff to an award of exemplary damages.

126.   Plaintiff is accordingly entitled to an award of damages in an amount to be proved at trial, exemplary damages, and other equitable relief.

## FIFTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

(Against All Defendants)

127.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth herein.

128.   As directors and officers of VMD and HGS and as the operating managers of the Project, Owen, Galvis and Doe defendants 1 through 10 held positions of trust as fiduciaries, and in that capacity owed fiduciary duties of care, good faith, fairness, honesty and loyalty to Plaintiff.

129.   Owen, Galvis and Doe defendants 1 through 10 breached those fiduciary duties by the conduct alleged in this complaint.

130.   Doe defendants 11 through 20 aided and abetted these breaches of duty by Owen, Galvis and Does 1 through 10.  Each of Does 11 through 20 was aware that the conduct of Owen, Galvis and Does 1 through 10 alleged herein breached the fiduciary duties they owed to Plaintiff and knew that the purpose and effect of those acts was to benefit Owen, Galvis and Does 1 through 10 at the expense of Plaintiff.  Despite that knowledge, Does 11 through 20 provided substantial assistance to Owen, Galvis and Does 1 through 10 in carrying out their conduct.

131.   These breaches of fiduciary duty and acts of aiding and abetting breaches of fiduciary duties have proximately caused Plaintiff to be damaged in an amount to be proved at trial by, inter alia, depriving Plaintiff of the value of his interest in the Project and HGS, and depriving Plaintiff of other rights and interests he would have received but for Defendants' conduct.

132.   Defendants' conduct in breach of the fiduciary duties owed to Plaintiff and which aided and abetted the breaches of fiduciary duties owed to Plaintiff were done with malice, oppression or fraud and with the intent to cause damage to Plaintiff, entitling Plaintiff to an award of exemplary damages.

133.   Plaintiff is accordingly entitled to an award of damages in an amount to be proved at trial, imposition of a constructive trust, exemplary damages, and other equitable relief.

## SIXTH CAUSE OF ACTION

### (Negligence)

(Against VMD, Owen, Galvis and Does 1-10)

134.   Plaintiff realleges and incorporates by reference the allegations

contained in the preceding paragraphs of this complaint, as though fully set forth herein.

135.   Each of VMD, Owen, Galvis and Does 1-10 owed Plaintiff a duty of care in their management and operation of the Project because, *inter alia*, it was they who induced Plaintiff and other investors to invest in the Project, failure to properly manage and operate the Project was likely to cause substantial financial harm to Plaintiff and other investors, there is an immediate connection between mismanagement or improper operation of the Project and harm to Plaintiff and other investors, it was foreseeable to these defendants that mismanagement of the Project would cause Plaintiff and other investors to suffer the damages they have suffered.

136.   VMD, Owen, Galvis and Does 1-10 breached that duty of care by failing to manage and operate the Project in the manner or with the degree of care that a reasonably prudent person would manage or operate it under the circumstances.

137.   These defendants' breach of their duty of care has actually and proximately caused injury Plaintiff consisting of, *inter alia*, loss of all or substantially all of the value of his investment in the Project and the lack of any return on that investment.

138.   Accordingly, Plaintiff is entitled to recover damages for the injuries he has suffered and is also entitled to other equitable and injunctive relief.

## SEVENTH CAUSE OF ACTION

### (Negligent Misrepresentation)

(Against VMD, Owen, Galvis and Does 1-10)

104.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, as though fully set forth

herein.

105.    As alleged herein, Owen and Galvis, acting on behalf of themselves and VMD, made false representations to Plaintiff and other investors in the Project regarding, *inter alia*, the status and timing of the Project, the status and likelihood of obtaining permits necessary to the Project and the causes of delays in the Project.

106.    When VMD, Owen and Galvis made those false representations, they had no reasonable ground for believing them to be true and, indeed, were aware of facts that would cause a reasonable person to doubt the accuracy of those representations.

107.    Each of VMD, Owen and Galvis owed a duty to Plaintiff to exercise reasonable care in giving information regarding the status and timing of the Project, the status and likelihood of obtaining permits necessary to the Project and the causes of delays in the Project.

108.    VMD, Owen and Galvis made those false and misleading statements and representations to Plaintiff with the intent to induce Plaintiff to rely upon them.

109.    Indeed, those representations and omissions were a material inducement to Plaintiff's investment of $850,000 in the Project in exchange for a working interest in it.

110.    Plaintiff's reliance on these statements by VMD, Owen and Galvis was justifiable under the circumstances.

111.    Plaintiff has been damaged by the conduct of VMD, Owen and Galvin alleged herein and his reliance on those defendants' false statements was a substantial factor in causing Plaintiff to suffer that harm.

112.    Plaintiff is accordingly entitled to an award of damages in an amount to be proved at trial and other equitable relief.

## **PRAYER**

Wherefore, Plaintiff prays for judgment against Defendants as follows:

1.      For general and incidental damages in an amount to be determined at trial;

2.      For equitable relief, including imposition of a constructive trust;

3.      For injunctive relief;

4.      For exemplary damages;

5.      For costs of suit herein, including reasonable attorneys' fees; and

6.      For such further relief as the Court may deem just and proper.


Dated April 26, 2020                    BOWSE LAW GROUP, A.P.C.



                                        ___/s/ Michael A. Bowse_____
                                        Michael A. Bowse


                                        HUFFINE CHUNG LLP



                                        ___/s/ Dustin Huffine_____
                                        Dustin Huffine


                                        Attorneys for Plaintiff, William Margaritis

COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury to the full extent permitted by law.

BOWSE LAW GROUP, A.P.C.

Dated:     April 26, 2020

_/s/ Michael A. Bowse_
Michael A. Bowse

HUFFINE CHUNG LLP
Dustin Huffine

Attorneys for Plaintiff, William
Margaritis

COMPLAINT