**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Margaritis, | No. CV-20-00807-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Vast Mountain Development Incorporated, et al., | |
| Defendants. | |

Plaintiff William Margaritis alleges that he invested $850,000 plus labor in Defendant Vast Mountain Development Incorporated's ("VMD") Congress Mine Gold & Silica Recycling Project ("the Project") in exchange for a fractional working interest in the Project. Margaritis claims he was led to be believe that gold extraction would be a significant component of the Project. He alleges that VMD—through two officers and directors, Defendants John Owen and Michael Galvis—knew at the time it solicited his investment that gold extraction was unlikely ever to occur because of environmental and regulatory obstacles to acquiring the necessary permits, continually misled him about the status of the gold extraction component of the Project, and misused the funds he invested. Margaritis' First Amended Complaint ("FAC") brings claims against all three Defendants for federal and state law securities fraud, common law fraud, negligence, and negligent misrepresentation. The FAC also brings a breach of fiduciary duty claim against Owen

and Galvis.[1] (Doc. 16.) Defendants have moved to dismiss Margaritis' FAC in its entirety under Federal Rule of Civil Procedure 12(b)(6). (Doc. 22.) The motion is fully briefed (Docs. 23, 25) and the Court heard oral argument on April 6, 2021. For reasons explained below, the motion will be granted in part and denied in part.

## I. Legal Standard

When analyzing a complaint for failure to state a claim to relief under Rule 12(b)(6), the Court accepts well-pled factual allegations as true and construes them most favorably to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The Court does not accept conclusions couched as factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), or "allegations that contradict matters properly subject to judicial notice[.]" *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). To avoid dismissal, the complaint must plead sufficient facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In addition, Federal Rule of Civil Procedure 9(b) requires a plaintiff to allege fraud with particularity. "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## II. Discussion

### A. Fraud Claims

Count I alleges federal securities fraud in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. This claim requires Margaritis to plead (1) a material misrepresentation or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Kui*

---

[1] The FAC also alleges a breach of fiduciary duty claim derivatively on behalf of Harvest Gold Silica Incorporated ("HGS"), an affiliate of VMD in which Margaritis also acquired an interest, but Margaritis has since acknowledged that he cannot bring a claim on behalf of HGS because he is not a shareholder. (Doc. 23 at 13.) Accordingly, the Court will dismiss Margaritis' derivative breach of fiduciary duty claim. The Court also will dismiss HGS as a party because Margaritis alleges no other claims on behalf of or against HGS.

*Zhu v. Taronis Technologies, Inc.*, No. CV-19-04529-PHX-GMS, 2020 WL 1703680, at *3 (D. Ariz. Apr. 8, 2020). Count II alleges securities fraud under A.R.S. § 44-1991, which prohibits "employ[ing] any device, scheme or artifice to defraud . . . [or] [m]aking any untrue statement of material fact, or omit[ting] to state any material fact necessary in order to make the statements made . . . not misleading" in connection with the sale or purchase of securities. The elements of this claim are largely the same as a federal securities fraud claim, except Margaritis is not required to plead economic loss. *See Aaron v. Fromkin*, 994 P.2d 1039, 1043 (Ariz. Ct. App. 2000). Count III alleges a common law fraud claim. This claim requires Margaritis to plead the following nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. *Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. Ct. App. 1978). The Court addresses these claims together because Defendants' arguments for dismissal overlap. (Doc. 22 at 5, 9.)

### 1. Puzzle Pleading

Defendants argue that the fraud claims must be dismissed because the FAC engages in impermissible "puzzle pleading," in that it requires Defendants "to comb through the complaint and determine which allegations correspond to the alleged claims." *Facciola v. Greenberg Traurig, LLP*, 781 F.Supp.2d 913, 920 (D. Ariz. 2011). The Court disagrees. Although the FAC is not a model of clarity, it "is neither rambling nor confusing," nor is it "so unruly" that it would be difficult for Defendants "to determine which allegations support which claims[.]" *Id.* at 921. Indeed, Defendants appear to have had no difficulty identifying the particular representations upon which Margaritis' fraud claims are based.

### 2. False Representations

Defendants raise several arguments as to why the FAC fails to allege actionable false statements.

First, Defendants argue that the FAC mischaracterizes the representations about

gold production. (Doc. 22 at 6.) This is a fair critique. The nature of the Project and Margaritis' investment are described in two documents: the Working Interest Purchase and Sale Agreement ("the Agreement") and the Sales Memorandum ("the Memo"), which functioned much like a business plan.[2] (Doc. 16 ¶ 19.) The Agreement states that VMD's "Plan of Operations" is "to recover and profitably sell gold, silica and other valuable metals and minerals[.]" (Doc. 22 at 22.) The Memo states that "[t]he Congress Tailings have two potential values, as a silica sand and the contained gold values." (*Id.* at 47.) It estimates that the Project could yield 100,350 ounces of recoverable gold, 295,290 ounces of recoverable silver, and 1.57 million tons of silica, which could be sold for $1,000 per ounce, $14 per ounce, and $50 per ton, respectively. (Doc. 22 at 39, 50.) The FAC takes liberties in describing the content of these documents. For example, the FAC alleges that the Agreement and Memo state "gold extraction was the primary purpose, central component and main operation of the Project," that the Memo "state[s] that gold extraction from the Congress Mine Tailings would be the primary revenue driver for the Project," and that the Memo "expressly describe[s] the returns that [Margaritis] . . . could expect to receive based almost solely on the value of the gold to be extracted." (Doc. 16 ¶¶ 20, 24, 25.) Although the Agreement and Memo fairly describe gold as *one* component of the Project and a significant portion of projected revenue, the FAC's allegations are hyperbolic.

In his response in opposition to Defendants' motion to dismiss, Margaritis wisely tempers his descriptions and clarifies that his "claim is not that defendants promised gold production would be the 'sole' or 'primary' aspect of the Project, but it turned out to be something less than that. . . . Instead, [Margaritis'] claim is that, at the time Defendants represented that gold production was a central purpose of the project . . . they knew that gold production was likely to never occur[.]" (Doc. 23 at 8-9.) The Court will not get bogged down in an argument over semantics, nor will it dismiss a complaint on account of hyperbole. The FAC, as clarified by the response brief, can be fairly read as claiming that,

---

[2] The Court can consider these documents without converting Defendants' motion to dismiss into a motion for summary judgment because they are referenced extensively in the FAC. *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

collectively, the statements and projections in the Agreement and Memo conveyed to Margaritis that gold excavation would be one of the Project's main purposes and would account for a significant portion of the projected revenue.  (Doc. 16 ¶¶ 20, 24, 25, 37; Doc. 23 at 11.)

Second, Defendants argue these statements regarding gold extraction are not actionable because they are forward-looking statements.  (Doc. 22 at 7.)  But forward-looking statements are actionable if the speaker knows at the time that they are false or misleading, or if the speaker is aware of undisclosed facts that seriously undermine the accuracy of the statement.  *See, e.g., Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992); *Allstate Life Ins. Co. v. Robert W. Baird & Co.*, 756 F. Supp. 2d 1113, 1165 (D. Ariz. 2010); 15 U.S.C.A. § 78u-5(c)(1)(A).  Here, Margaritis alleges that Defendants knew at the time they solicited his investment that gold extraction was unlikely to ever occur because of environmental and regulatory obstacles to securing the necessary permits.  (Doc. 16 ¶¶ 34-35, 79-84.)  At this stage, the Court must accept Margaritis' allegations as true.

Third, Defendants argue that post-investment representations demonstrate that Defendants made a business decision to focus on silica, rather than gold, because of increased market demand.  (Doc. 22 at 7.)  Although this might prove to be a meritorious defense at a later stage of this litigation, it does not require dismissal of Margaritis' fraud claims.  Margaritis alleges that Defendants fabricated their silica sales to divert attention from the lack of progress on the gold excavation aspects of the Project.  (Doc. 16 ¶¶ 60-61, 74-76.)  These allegations might later prove false, but at this stage the Court must accept them as true.

Fourth, Defendants argue that Margaritis' allegations concerning permit approval are not actionable because these statements were true when made.  (Doc. 22 at 7-8.)  Again, this might prove to be a meritorious defense at a later stage of this litigation, but Margaritis alleges that Defendants represented the required permits were near issuance, even though they knew at the time that the permits required for gold extraction would likely never be

approved because of environmental and regulatory issues. The Court must accept Margaritis' allegations as true and construe them in his favor for present purposes.[3]

Lastly, Defendants argue that, to the extent Margaritis' fraud claims are based on post-investment representations, those representations are not actionable because they were not made in connection with the purchase or sale of a security and Margaritis could not plausibly have invested in reliance on them. (Doc. 22 at 6.) The Court agrees. Margaritis alleges that, between October 2016 and March 2018, he invested $850,000 and labor (in the form of consulting services) in exchange for working interests in the Project. (Doc. 16 ¶¶ 38, 52.) He also alleges that, sometime after October 4, 2018, he provided consulting services to VMD's affiliate, HGS, in exchange for a profits interest stake in that company. (*Id.* at ¶ 69 fn.3.) Any representations by Defendants that occurred after Margaritis provided these consulting services are not actionable.

### 3. Economic Loss

Defendants argue that the FAC does not allege economic loss as a result of the alleged misrepresentations. (Doc. 22 at 8-9.) They argue that Margaritis "ignores the significant and lucrative production of silica sand—a market that looks to be increasingly productive and profitable for the Project." (*Id.* at 8.) This might prove true at a later stage of this litigation, but for present purposes the Court must accept Margaritis' allegations as true, and Margaritis alleges that he invested $850,000 plus valuable labor in exchange for interests in the Project and HGS, and that his investment is now worthless because the Project has produced no gold and Defendants have fabricated their silica sales.

### 4. Loss Causation

Defendants argue that Margaritis fails to allege loss causation. (Doc. 22 at 8-9.) The Court disagrees. Margaritis identifies his loss as his $850,000 cash investment and the value of his consulting services, and he alleges that he would not have invested money and resources into the Project and HGS had it not been for Defendants' false or misleading

---

[3] The Court also notes that Margaritis' fraud claims are, in part, based on alleged misrepresentations about the use of investment funds to purchase equipment. Defendants do not specifically address this aspect of the FAC.

statements about gold excavation, including the status and progress of permitting and equipment acquisition.

### B. Breach of Fiduciary Duty

Margaritis alleges that "as the operating managers of the Project," Owen and Galvis "held positions of trust as fiduciaries, and in that capacity owed fiduciary duties of care, good faith, fairness, honesty and loyalty to" him. (Doc. 16 ¶ 142.) He also alleges that Owen and Galvis "received the monies invested by Plaintiff . . . towards the Project as trustees, with fiduciary duties to apply those funds in the best interests of the Project, rather than to themselves for their own personal gain." (*Id.*) Margaritis claims that Owen and Galvis "breached those fiduciary duties by . . . redirecting to their own interests and benefit the monies that Plaintiff . . . contributed to the Project rather than using that money to obtain permits and equipment necessary to conduct gold operations at the Congress Mine tailings." (*Id.* ¶ 143.)

Defendants argue that this claim must be dismissed because Owen and Galvis owe no fiduciary duties to Margaritis. They contend that whether a fiduciary duty exists between the operator of a working interest and a non-operator depends on the language of the working interest agreement. They further note that, here, the Agreement expressly provides that it shall not be "construed to constitute a partnership, a joint venture relationship, or an agent-principal relationship between the parties," and instead, "[t]he sole relationship between the parties is that of an independent buyer and an independent seller." (Doc. 22 at 14.)

For his part, Margaritis does not argue that the Agreement creates a fiduciary relationship. To the contrary, he explicitly states "[t]he fiduciary duties upon which [his] claims are based do not arise from that contract." (Doc. 23 at 18.) He does, however, quarrel with the proposition that the parties' contract is the *only* possible source of a fiduciary duty between an operator of a working interest and non-operator.

In Arizona, a contractual disclaimer of fiduciary duties is not necessarily dispositive because "fiduciary duties exist (or not) as a matter of law based on the nature of a

relationship." *See Realty Executives Int'l Inc. v. RE/EX California Inc.*, No. 2:09-CV-00562-RCJ, 2011 WL 13185715, at *7 (D. Ariz. June 1, 2011). Neither party cites Arizona authority regarding whether the relationship between a working interest operator and a non-operator is the type of a special relationship that gives rise to a fiduciary duty, and the out-of-state authorities they cite on this question are mixed. *Compare, e.g.*, *Bays Exploration, Inc. v. PenSa, Inc.*, 771 F. Supp. 2d 1289, 1299 (W.D. Okla. 2011) ("Oklahoma courts have repeatedly held that an operator does not owe its non-operating working interest owners a fiduciary obligation; instead, the duties imposed by a joint operating agreement are contractual obligations[.]"), *with Conoco Inc. v. J.M. Huber Corp.*, 148 F.Supp.2d 1157, 1171-72 (D. Kan. 2001) ("Oklahoma law does recognize that some fiduciary relationship exists between unit operators and interest owners. . . . It is under this relationship that several duties arise. For example, Oklahoma law has recognized that operators have a duty to maximize unit production, sell the oil at a fair price, and, in general, operate the unit as a prudent operator. These duties are not unique to the oil business. They are simply common sense applications of the general notions of fiduciary law.). Because the Court is not persuaded that the law clearly favors either party on this issue, it declines to resolve it at the motion to dismiss stage. "Arizona and federal courts are in agreement that generally the question of whether a fiduciary relationship exists is a question of fact." *S.E.C. v. Rauscher Pierce Refsnes, Inc.*, 17 F. Supp. 2d 985, 992 (D. Ariz. 1998). The Court will await factual development before determining whether the nature of the parties' relationship gave rise to any fiduciary duties.

**C. Negligence**

Defendants argue, Margaritis' negligence claim is barred by the economic loss doctrine. (Doc. 22 at 15.) The economic loss doctrine is "a common law rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *Flagstaff Affordable Hous. Ltd. P'Ship v. Design All., Inc.*, 223 P.3d 664, 667 (Ariz. 2010). The doctrine's principal function "is to encourage private ordering of economic relationships and to

uphold the expectations of the parties by limiting a plaintiff to contractual remedies for loss of the benefit of the bargain." *Id.* at 671. A formulation of the economic loss rule that eliminates recovery under all tort theories is "overly broad." *Id.* at 667. Instead, the economic loss rule "may vary in its application depending on context-specific policy considerations." *Id.* at 669. Courts therefore should consider the underlying policies of tort and contract law when determining whether the rule applies to a particular case. *See Greyhound Lines Inc. v. Viad Corp.*, No. CV-15-01820-PHX-DGC, 2016 WL 6833938, at *7 (D. Ariz. Nov. 11, 2016).

Here, both parties agree that the economic loss doctrine only affects tort claims that concern conduct specifically at issue in the contract. (Doc. 23 at 17; Doc. 25 at 9.) Margaritis, however, presents no argument as to why his negligence claim does not meet this standard. It clearly does. The Agreement states "VMD is the operator of the Project, and commits to operate in a workmanlike manner through completion of the Project[.]" (Doc. 22 at 22.) The FAC's negligence claim alleges that Defendants owed Margaritis a duty of care in their management and operation of the Project, that they breached that duty by failing to manage and operate the Project in a reasonably prudent way, and that the breach resulted in the loss of his investment. (Doc. 16 ¶¶ 149-151.) At bottom, this is a claim that Defendants breached the Agreement by failing to operate the Project in a workmanlike manner, as required. Margaritis identifies no special policy considerations that would justify recovery in tort for conduct that plainly is covered by the Agreement. Margaritis argues that the economic loss doctrine cannot bar his negligence claim against Owen and Galvis because they are not parties to the Agreement. But he ignores that, in operating the Project, Owen and Galvis acted as principals of VMD. (*See* Doc. 16 ¶¶ 9-10, 12.) Accordingly, the Court will dismiss Margaritis' negligence claim because it seeks purely economic losses for conduct squarely covered by the Agreement.

### D. Negligent Misrepresentation

"The elements of negligent misrepresentation are: (1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on

1  the incorrect information or knew that it reasonably would rely; (3) the defendant failed to
2  exercise reasonable care in obtaining or communicating the information; (4) the plaintiff
3  justifiably relied on the incorrect information; and (5) resulting damage." *KB Home*
4  *Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 340 P.3d 405, 412 (Ariz. Ct. App. 2014).
5  Margaritis alleges that Defendants representations concerning "the status and timing of the
6  Project, the status and likelihood of obtaining permits necessary to the Project and the
7  causes of delays in the Project" were false, they intended for Margaritis to rely on the
8  incorrect information, they "were aware of facts that would cause a reasonable person to
9  doubt the accuracy of those representations" and therefore failed to exercise reasonable
10 care in communicating this information to him, and "those representations and omissions
11 were a material inducement to [his] investment of $850,000 in the Project in exchange for
12 a working interest in it[.]" (Doc. 16 ¶¶ 105-109.)

13 Defendants first argue that Margaritis has not adequately pled damages. (Doc. 22
14 at 16.)  The Court disagrees.  Margaritis alleged that he was damaged because he invested
15 $850,000 in reliance on the alleged misrepresentations.

16 Defendants next argue that representations post-dating Margaritis' $850,000
17 investment cannot form the basis of a negligent misrepresentation claim because Margaritis
18 could not plausibly have relied on those statements when making his investment. (Doc. 22
19 at 17.)  The Court agrees.  Unlike his fraud claims, Margaritis does not allege the value of
20 his consulting services as a damage for his negligent misrepresentation claim.  Instead,
21 Margaritis alleges only that he invested $850,000 in reliance on Defendants' alleged
22 misrepresentations.  According to the FAC, Margaritis invested that $850,000 in four
23 installments beginning in October 2016 and continuing through the following year
24 (apparently into September 2017, when he signed the Agreement).  Any representations
25 after Margaritis completed his $850,000 therefore cannot serve as a basis for his negligent
26 misrepresentation claim.

27 Finally, Defendants argue that Margaritis cannot allege that the statements in the
28 Agreement and Memo concerning the status and timing of the Project and the necessary

1  permits were false because those statements were promises of future conduct. (Doc. 22 at
2  17.) "Arizona courts have adopted the general rule that '[n]egligent misrepresentation
3  requires a misrepresentation or omission of a fact. A promise of future conduct is not a
4  statement of fact capable of supporting a claim of negligent misrepresentation.'" *Kennedy*
5  *v. Chase Home Finance, LLC*, No. CV11-8109-PCT-DGC, 2012 WL 1132785, at *5 (D.
6  Ariz. Apr. 4, 2012).

   The Court agrees that some of the relevant statements are promises of future conduct. For example, Defendants' gold excavation projections and their estimated timeline for the Project are necessarily statements about future conduct. Indeed, in the context of his fraud claims, Margaritis did not seriously contend that these statements were not forward-looking; he simply argued (persuasively) that they fell outside the ordinary exception for forward-looking statements because Defendants knew these projections were unrealistic and did not believe those forward-looking statements at the time they were made. But other alleged misrepresentations appear to be about the present facts, such as whether required permits were currently being reactivated. (*See, e.g.*, Doc. 16 ¶ 27.) At this stage, the Court must accept these allegations as true. Accordingly, the Court will not dismiss Margaritis' negligent misrepresentation claim.

### III.  Miscellaneous Matters

After the Court heard oral argument, Margaritis filed a request asking the Court to take judicial notice of certain state court records that he argues contain admissions shoring up his claims. (Doc. 33.) Defendants oppose the request. (Doc. 34.) Margaritis later filed a motion seeking leave to file a Bondholder Affidavit, evidently to shore up his allegations that Defendants fabricated their silica sales. (Doc. 35.) Defendants oppose this request as well. (Doc. 37.)

Ordinarily, the Court does not consider matters outside the pleadings when ruling on a motion to dismiss. Indeed, the purpose of a motion to dismiss is to test the sufficiency of the allegations in the complaint, not to determine whether those allegations are, in fact, true or false. Given the Court's ruling on the motion to dismiss, there is no need for it to

consider material outside the pleadings. The Court therefore denies both requests, but Margaritis remains free to submit any relevant materials to support his claims at summary judgment or at trial, provided they are admissible.

**IT IS ORDERED** as follows:

1. Defendants' motion to dismiss (Doc. 22) is **GRANTED IN PART** and **DENIED IN PART** as explained herein.
2. Margaritis' request for judicial notice (Doc. 33) and motion for leave to file a Bondholder Affidavit (Doc. 35) are **DENIED**.

Dated this 18th day of January, 2022.

Douglas L. Rayes
United States District Judge